IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-785

Filed 6 May 2026

Office of Administrative Hearings, Nos. 24DHR02724 and 24DHR02730

REX HOSPITAL, INC., Petitioner,

v.

N.C. DEPARTMENT OF HEALTH AND HUMAN SERVICES, DIVISION OF HEALTH SERVICE REGULATION, HEALTHCARE PLANNING AND CERTIFICATE OF NEED, Respondent,

and

WAKEMED AND DUKE UNIVERSITY HEALTH SYSTEM, INC., Respondent-Intervenors.

_____

DUKE UNIVERSITY HEALTH SYSTEM, INC., Petitioner,

v.

N.C. DEPARTMENT OF HEALTH AND HUMAN SERVICES, DIVISION OF HEALTH SERVICE REGULATION, HEALTHCARE PLANNING AND CERTIFICATE OF NEED, Respondent,

and

WAKEMED AND REX HOSPITAL, INC., Respondent-Intervenors.

Appeal by petitioners from order entered 14 April 2025 by Administrative Law Judge Melissa Owens Lassiter of the North Carolina Office of Administrative Hearings. Heard in the Court of Appeals 25 March 2026.

*K&L Gates LLP, by Gary S. Qualls, Anderson M. Shackelford, and Nathan A. Huff, for Petitioner-Appellant Rex Hospital, Inc.*

*Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., by Iain M. Stauffer and William F. Maddrey, for Petitioner-Appellant Duke University Health System, Inc.*

*Fox Rothschild, LLP, by Marcus C. Hewitt and Elizabeth Sims Hedrick, for Respondent-Intervenor-Appellee WakeMed.*

*Attorney General Jeff Jackson, by Assistant Attorney General Farrah R. Raja, Assistant Attorney General Julie M. Faenza, and Assistant Attorney General Ashley C. Council, for Respondent-Appellee North Carolina Department of Health and Human Services, Division of Health Service Regulation, Healthcare Planning and Certificate of Need Section.*

FLOOD, Judge.

Petitioners Duke University Health System, Inc., and Rex Hospital, Inc., appeal from Administrative Law Judge ("ALJ") Melissa Owens Lassiter's final decision affirming the North Carolina Department of Health and Human Services, Division of Health Service Regulation, Healthcare Planning and Certificate of Need Section's (the "Agency") decision to grant Respondent WakeMed's Certificate of Need ("CON") application to develop acute care beds and to deny Petitioners' CON applications. On appeal, Petitioners collectively argue the ALJ erred by: first, failing to conclude that WakeMed's amendments to its CON applications disqualified it from review; second, finding WakeMed's applications conformed to the Agency's performance standards for acute care beds; third, affirming the Agency's comparative analysis; and fourth, determining Petitioners failed to establish substantial

prejudice. Upon careful review, we conclude: first, WakeMed did not materially amend its application where the information was previously available to the Agency; second, the Agency properly found WakeMed conformed to the standards when reworking the projection numbers as it was allowed to do, and the decision was supported by competent evidence; and third, the Agency's findings on the comparative analysis did not violate any statutes, and were supported by substantial evidence. Because we determine Petitioners did not show error in the Agency's decision, we do not reach Petitioners' substantial prejudice argument.

## I. **Factual and Procedural Background**

The North Carolina 2023 State Medical Facilities Plan identified a need for forty-four acute care beds in Wake County. In response to this need, four CON applications were submitted by Duke, Rex, and WakeMed, with WakeMed submitting two applications, one each for its hospitals in Cary and North Raleigh. WakeMed's two CON applications sought to develop thirty-five acute care beds at WakeMed North Raleigh and nine beds at WakeMed Cary; Duke's CON application sought to develop forty-one beds; and Rex's CON application sought to develop forty-four beds. These applications were submitted to the Agency.

During the application review period, the Agency, Rex, and Duke each identified an error in WakeMed's applications. WakeMed had used projection numbers from a previous CON application from 2022 that was granted to develop thirty-one acute care beds at its Garner location by 2027 and subsequently failed to

adjust its numbers accordingly in its 2023 applications, leaving some patients double-counted. As the Agency was reviewing the applications, however, one of the project analysts, Greg Yakaboski, noticed WakeMed was missing the "projected shift" the Garner project would have on WakeMed's numbers. Mr. Yakaboski explained that part of his role was to "test the reasonableness of these projections[,]" and he "[r]edid the calculations to make sure that as to the WakeMed Health System for project year 2028, the . . . minimum target threshold was still met, which it was." Mr. Yakaboski acknowledged that Rex and Duke were able to discover this error from viewing the available "Garner Hospital application, Project ID J-12264-22." In response to the identified error, WakeMed transmitted to the Agency an attachment "for illustrative purposes," showing its projected numbers with the Garner project taken into account.

The Agency determined the four applications met "all applicable statutory and regulatory review criteria[,]" but, because the applications "collectively propose[d] to develop 129 additional acute care beds in the Wake County service area," it must conduct "a comparative analysis of the proposals to decide which proposal should be approved" since only forty-four beds were needed and could be approved. The Agency used the following ten factors when comparing the CON applications:

> (1) conformity with the review criteria;
> (2) scope of services;
> (3) geographic accessibility;
> (4) historical utilization;
> (5) competition or access to a new or alternate provider;
> (6) access by service area residents;
> (7) access by Medicare recipients;

(8) access by Medicaid recipients;
(9) projected average net revenue per patient; and
(10) projected average operating expense per patient.

In its comparative analysis, the Agency concluded only four of the factors "differentiated any applicant from the others[,]" finding that WakeMed Cary's CON application was "the most or more effective alternative" for "[g]eographic [a]ccessibility" and "[h]istorical [u]tilization," and WakeMed North's CON application was "the more effective alternative" for "[g]eographic [a]ccessibility" and "[h]istorical [u]tilization"; Duke's CON application was "the more effective alternative" for "[c]ompetition/[a]ccess to a [n]ew [p]rovider[,]" and Rex's CON application was "the more effective alternative" for "[s]cope of [s]ervices." Based on these conclusions, the Agency conditionally approved WakeMed's two CON applications and denied Duke's and Rex's applications.

Duke and Rex filed petitions for a contested case hearing to the Office of Administrative Hearings (the "OAH") regarding the Agency's decision, and their petitions were subsequently consolidated. While the matter was pending, Rex filed motions for summary judgment against Duke, WakeMed, and the Agency on 23 September 2024. In its motions, Rex argued Duke and WakeMed's CON applications should have been disqualified because they were improperly amended, and WakeMed's applications did not conform with Criterion 3 and the performance standards for acute care beds under 10A N.C.A.C. 14C.3803 ("Performance Standards"). Duke and WakeMed subsequently filed motions for summary judgment

on this issue against Rex.

The ALJ heard these contested cases. On 5 March 2025, the ALJ denied Rex's summary judgment motions, granted Duke's and WakeMed's, and found that neither Duke nor WakeMed amended their CON applications, but concluded there were still "genuine issues of material fact precluding summary judgment on the issue of WakeMed's conformity with Criterion 3 and the [P]erformance [S]tandards[.]"

Soon thereafter, on 14 April 2025, the ALJ entered an order affirming the Agency's decision (the "Final Decision"). Duke and Rex timely appeal.

## II. <u>Jurisdiction</u>

Petitioners' appeal from the final decision of an administrative law judge is properly before this Court pursuant to N.C.G.S. §§ 7A-29(a) and 131E-188(b) (2023).

## III. <u>Standard of Review</u>

Pursuant to N.C.G.S. § 150B-51(b):

> The court reviewing a[n agency's] final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
>
> (3) made upon unlawful procedure;
>
> (4) Affected by other error of law;

(5) Unsupported by substantial evidence admissible under
[N.C.]G.S. [§§] 150B-29(a), 150B-30, or 150B-31 [(2023)] in
view of the entire record as submitted; or

(6) Arbitrary, capricious, or an abuse of discretion.

N.C.G.S. § 150B-51(b) (2023). "The first four grounds for reversing or modifying an

agency's decision are . . . law-based inquires that we review de novo[,]" *CaroMont*

*Health, Inc. v. N.C. Dep't of Health & Hum. Servs.*, 231 N.C. App. 1, 4 (2013) (citations

and internal quotation marks omitted), wherein this Court "considers the matter

anew and freely substitutes its own judgment for that of the trial court[,]" *McMillan*

*v. Ryan Jackson Props., LLC*, 232 N.C. App. 35, 39 (2014) (citation and internal

quotation marks omitted). Under the last two grounds, "a reviewing court employs

the whole-record test to review fact-intensive issues[.]" *Pinnacle Health Servs. of N.C.*

*LLC v. N.C. Dep't of Health & Hum. Servs.*, 388 N.C. 390, 398 (2025) (citation and

internal quotation marks omitted); *see also* N.C.G.S. § 150B-51(c) (2023). "Under this

standard, courts must examine all the record evidence—that which detracts from the

ALJ's findings and conclusions as well as that which tends to support them—to

determine whether there is substantial evidence to justify the ALJ's decision."

*Pinnacle Health Servs.*, 388 N.C. at 398 (citation modified).

## IV. Analysis

Although Duke and Rex appeal separately, their arguments are reducible to

four main positions across both appeals, namely that the ALJ erred by (A) failing to

conclude that WakeMed's amendments to their CON applications disqualified them,

and the Agency should not have been allowed to recalculate WakeMed's projections; (B) finding WakeMed's application conformed to the standards; (C) affirming the Agency's comparative analysis; and (D) determining Duke and Rex failed to establish substantial prejudice. We address each argument in turn.

**A. CON Application Amendments**

First, Rex argues WakeMed's and Duke's applications should have been disqualified because they materially amended their CON applications. We disagree.

*1. WakeMed's Amendment*

Rex contends that WakeMed impermissibly amended its applications when it submitted an attachment reconfiguring its projection numbers. We disagree.

Pursuant to N.C.G.S. § 131E-183(a)(3), "[t]he *applicant* shall identify the population to be served by the proposed project, and shall demonstrate the need that this population has for the services proposed . . . ." N.C.G.S. § 131E-183(a)(3) (2023) (emphasis added). Furthermore, "[a]n *applicant* . . . shall . . . *provide projected utilization* of the existing, approved, and proposed acute care beds for the applicant hospital during each of the first three full fiscal years of operation following completion of the project[.]" 10A N.C.A.C. 14C.3803(2) (2025) (emphasis added).

Once an application is deemed complete, "[a]n applicant may not amend an application for a certificate of need[.]" *Presbyterian-Orthopaedic Hosp. v. N.C. Dep't of Hum. Res.*, 122 N.C. App. 529, 537 (1996) (citations omitted); *see also* 10A N.C.A.C. 14C.0204 (2025) ("An applicant may not amend an application."). This does not mean,

however, that all amendments disqualify an application; rather, only *material* amendments disqualify applications, such that the agency's approval was based on the amendment. *WakeMed v. N.C. Dep't of Health & Hum. Servs.*, 222 N.C. App. 755, 759 (2012). Information already available to the Agency at the time of its decision is not a material amendment. *Dialysis Care of N.C., LLC v. N.C. Dep't of Health & Hum. Servs.,* 137 N.C. App. 638, 647–48, *aff'd*, 353 N.C. 258 (2000).

Rex relies on *Presbyterian-Orthopaedic* for the proposition that WakeMed's attachment was a material amendment. In *Presbyterian-Orthopaedic*, three hospitals—Presbyterian-Orthopaedic Hospital, Mercy Hospital, Inc., and Stanly Memorial Hospital, Inc.—submitted CON applications "to develop rehabilitation beds at their respective hospitals." 122 N.C. App. at 531. The Agency approved Stanly's application. *Id.* On appeal, however, our Supreme Court concluded that Stanly had impermissibly materially amended its application. *Id.* at 537–38. The Court explained that "all of Stanly's logistical and financial data in its completed [CON] application was based on having Milestone as Stanly's management company"; however, "the record contain[ed] a letter . . . from the president of Milestone expressing his disappointment in Milestone not being chosen by Stanly as its management company for the ten bed rehabilitation project[,]" and testimony from Stanly's President and Chief Operating Officer that Stanly had telephoned Milestone to inform it that Stanly would likely be working with another management company "if and when [Stanly was] allowed to develop the beds." *Id.* at 537 (alteration in

original). Thus, the Court concluded that this evidence was sufficient "to show that Stanly had decided not to use Milestone as its management company before Stanly's [CON] application was approved and that Stanly's actions constituted a material amendment to its application." *Id.*

We find the present case, however, to be more akin to *WakeMed*, 222 N.C. App. at 759. In *WakeMed*, four hospitals—WakeMed, Rex, Duke, and Holly Springs Surgery Center, LLC ("HSSC")—submitted CON applications to develop "three new operating rooms in Wake County." 222 N.C. App. at 756–57. The Agency approved HSSC's application. *Id.* at 757. On appeal to this Court, Rex argued HSSC impermissibly amended its application where "HSSC omitted Sections III.3–III.9 and a letter of support from Triangle Orthopedic Associates ('TOA') from its application" and then "filed the missing application sections and the missing letter of support . . . during the responsive comment period of the application process." *Id.* at 759. We concluded this was not a material amendment because, unlike *Presbyterian-Orthopaedic*, where "'*all of [the applicant's] logistical and financial data* in its completed certificate of need application was based' on utilizing the original management company[,]" HSSC's omissions had been referenced elsewhere and were not necessary to the evaluation, and approval was not based on the subsequent information. *Id.* (first alteration in original) (quoting *Presbyterian-Orthopaedic*, 122 N.C. App. at 537). We explained:

> The TOA letter of support submitted by HSSC in

responsive comments was referenced in the application when the application was originally submitted to the CON Section; that the TOA surgeons had submitted a letter expressing their support for HSSC's proposed facility was one of the representations made in the application. The signatories to the TOA letter were identical to the TOA surgeons identified by name in HSSC's application. Thus, providing the substance of the TOA letter did not amount to a "material change" to the representations made in HSSC's application.

As for Sections III.3–III.9, the Agency found that these missing materials were not necessary to evaluate HSSC's application conformity because the answers for the questions in these sections were found elsewhere in the application. Additionally, [the project analyst and his supervisor] testified that their approval of HSSC's application was not based on the materials HSSC filed after the application was deemed complete.

*Id.* at 759–60. Thus, we concluded HSSC did not impermissibly amend its application. *Id.* at 760.

Here, WakeMed erred in its calculation projections by failing to account fully for its 2022 Garner CON application approval and subsequently provided an updated projection via an attachment. Unlike *Presbyterian-Orthopaedic*, not "all" of WakeMed's "logistical and financial data" in its applications were based on this change, *see Presbyterian-Orthopaedic*, 122 N.C. App. at 537, as the Record reveals that "WakeMed's applications *partially* addressed the shift of patients from Raleigh to Garner by accounting for the patient shift from zip code 27610, but not from five other zip codes." Like HSSC's application in *WakeMed*, WakeMed's subsequent information in the attachment was referenced in the original application, albeit

erroneously calculated. *See WakeMed*, 222 N.C. App. at 759. Furthermore, like HSSC's omissions, the attachment was not necessary for the evaluation and approval was not based on it, as information to correct the projections was already available to the Agency as the projection numbers involved the previously granted 2022 Garner CON application. *See Dialysis Care*, 137 N.C. App. at 648. Additionally, the Record reveals that Mr. Yakaboski testified he did not use WakeMed's attachment. Accordingly, we conclude the ALJ did not err in concluding as a matter of law that WakeMed did not materially amend its applications.

## *2. Duke's Amendment*

Rex also argues Duke materially amended its 2023 CON application because of statements made in subsequent CON applications. In sum, Rex contends that, because Duke's subsequent CON applications propose to develop more acute beds for the next cycle, "Duke can't develop all 70 beds it proposes in its 2024 Applications in addition to the 41 it proposes in its 2023 Application and still meet the Performance Standards"; thus, by this, "Duke confirms it doesn't commit to developing any more than 22 of the 41 beds from its 2023 Application."

In reviewing the Agency's decision, "[t]he hearing officer is properly limited to consideration of evidence which was before the Section when making its initial decision . . . ." *In re Wake Kidney Clinic, P.A.*, 85 N.C. App. 639, 643 (1987).

Here, the ALJ concluded, in relevant part:

15. The relevant review period for this Tribunal in this contested case is the time period of the Agency's decision from the 2023 Wake County Acute Care Bed Review, the subject of these contested cases, which concluded on January 26, 2024.

16. Rex contends that Duke materially amended its 2023 CON Application submitted during the 2023 Wake County Acute Care Bed Review with statements contained in Duke's new 2024 CON Applications which were submitted on August 15, 2024, two []hundred and two days after the Agency issued its decision in the 2023 Wake County Review.

17. All of Rex's forecasted evidence, Duke's 2024 CON Applications, which Rex asserts supports its claim, postdates the Agency's decision and is thus not admissible.

18. For the reasons stated in Duke's Response, this Tribunal concludes as a matter of law that Rex has failed to forecast any admissible evidence which would allow it to advance its claim at trial and that Rex's Motion must be denied.

(Citations omitted.) Thus, because the ALJ correctly concluded that Duke's 2024 CON application was not available to the Agency at the time it reviewed Duke's 2023 CON application, the ALJ properly determined that this evidence was not admissible, and thus, Duke did not impermissibly amend its application. *See id.*

**B. Conformity with Criterion 3 and Performance Standards**

Next, Petitioners argue the ALJ erred in upholding the Agency's determination that WakeMed's applications "conformed with all statutory criteria, including Criterion 3, and the applicable [P]erformance [S]tandards." We disagree.

*1. Recalculation*

First, Petitioners argue that, if this Court does not conclude WakeMed materially amended its applications, the Agency committed legal error when it recalculated WakeMed's projections. Specifically, Petitioners contend that, since it is the applicant's burden by statute to demonstrate conformity with Criterion 3 and the Performance Standards, the Agency was not allowed to correct WakeMed's projections. According to Rex, "[w]hen the Analyst impermissibly took over WakeMed's burden to demonstrate conformity, he changed nearly every number in every table in the WakeMed [a]pplications that bore upon projected utilization at WakeMed Raleigh and the WakeMed hospital system"; thus, "[t]he Agency therefore impermissibly rewrote WakeMed's entire need methodology in violation of the CON statute and Performance Standards and the ALJ erroneously and arbitrarily affirmed that action." Because Petitioners contend this is an error of law, we review this issue de novo. *CaroMont,* 231 N.C. App. at 4.

Our statutes provide that the Agency "shall review all applications utilizing the criteria outlined in this subsection and shall determine that an application is either consistent with or not in conflict with these criteria[.]" N.C.G.S. § 131E-183 (2023). We have "previously recognized that the Agency may take into account information beyond that contained within the application itself in making its decision." *AH N.C. Owner LLC v. N.C. Dep't of Health & Hum. Servs.*, 240 N.C. App. 92, 121 (2015) ("Our conclusion that the ALJ erred in determining that [the applicant] must be found nonconforming because its omissions prevented a meaningful analysis

of Criterion 20 is not a departure from the well-established principle that the burden rests with the applicant to demonstrate that the CON review criteria are met." (citation and internal quotation marks omitted)); *see also In re Wake Kidney Clinic, P.A.*, 85 N.C. App. at 643 (holding it was not error for an agency to rely on information outside the application that "was available to it at the time of the original decision").

Further, the ALJ considered this matter, finding:

> 56. The Agency does not take a "zero tolerance" approach to mistakes or omissions in an application and does not automatically deny an applicant because of an error or omission in its application. Neither is there a statute, rule, or other authority that requires the Agency automatically deny an application with mistakes or omissions.
>
> 57. Instead, the Agency's longstanding practice is to analyze an error or omission to determine whether the application is nevertheless conforming if it has sufficient information to do so. Analysts are expected to correct mistakes or evaluate their effect on conformity, including making assumptions as necessary. Similarly, the Analyst testified that the Agency is permitted to do its own calculations, use publicly available information, and make different assumptions to test the reasonableness of an applicant's assumptions.
>
> 58. The Agency can also consider publicly available information outside the applications when determining conformity.
>
> 59. The 2022 Garner Application is a public document that was publicly available. The Analyst consulted the projections for WakeMed Garner in the 2022 Garner Application because they had been incorporated by reference in the 2023 WakeMed Applications.
>
> 60. To account for the inadvertent double-counting in this

review, the Analyst performed a calculation to quantify the effect of the shift of patients from WakeMed Raleigh to Garner on WakeMed's utilization projections.

. . . .

69. Mr. Yakaboski and Ms. Pittman both testified that the Agency's longstanding interpretation of the law is that the Agency can and should look to information outside the application to evaluate conformity to judge applications on their merits. That discretion includes the Analyst's ability to do their own analysis to quantify the effect of an error or omission in an application.

70. Rex's expert, Mr. Carter, opined that the WakeMed Applications should have been denied because of the mistaken double-counting of the Garner Patient Shift. However, Mr. Carter acknowledged that the Agency has discretion to analyze the effect of errors when determining conformity, and that the Agency does that, *and should do that*, as part of its analysis.

(Citations omitted.)

Thus, we conclude it was not error for the Agency to use information "available to it at the time of its original decision" to calculate what the accurate projections of WakeMed's would be. While the burden remains on the applicant to "provide *projected* utilization of the existing, approved, and proposed acute care beds . . .[,]" 10A N.C.A.C. 14C.3803(2) (emphasis added), Petitioners have failed to point to any law that prevents the Agency from correcting projected utilization errors.

*2. Conformity*

Next, Petitioners argue the ALJ erred in affirming the Agency's determination that WakeMed's applications conformed with the required standards. As this

challenge alleges the ALJ's decision as being either arbitrary or unsupported by evidence, we review this argument under the whole record test. *Pinnacle Health Servs.*, 388 N.C. at 398.

"The whole record test places the burden on the party seeking judicial review to challenge specific findings of fact and show that the ALJ's decision was not reasonably supported by substantial evidence." *Id.* at 402. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *N.C. State Bar v. Talford*, 147 N.C. App. 581, 588 (2001) (citation and internal quotation marks omitted), *aff'd as modified*, 356 N.C. 626 (2003). "[T]he 'whole record' test is not a tool of judicial intrusion; instead, it merely gives a reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence." *N.C. Dep't of Env't & Nat. Res. v. Carroll*, 358 N.C. 649, 674 (2004) (citation omitted).

Although whole record review "mandates that the reviewing court must take into account any contradictory evidence or evidence from which conflicting inferences may be drawn," *Talford*, 356 N.C. at 632, "the reviewing court 'may not substitute its judgment for the ALJ's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter *de novo*[,]'" *N.C. Dep't of Pub. Safety v. Ledford*, 247 N.C. App. 266, 286 (2016) (citation omitted). "It is for the agency, not a reviewing court, 'to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts,

and to appraise conflicting and circumstantial evidence, if any.'" *Carroll*, 358 N.C. at 674 (quoting *State ex rel. Utils. Comm'n v. Duke Power Co.*, 305 N.C. 1, 21 (1982)). Our Supreme Court has explained:

> A reviewing court does not scour the record itself searching for evidence that might undermine the ALJ's conclusion. That is the job of an appellant; thus, the party seeking judicial review has the burden to show that the ALJ's decision was not reasonably supported by substantial record evidence and narrow the scope of judicial review by challenging specific findings of fact to that effect.

*Pinnacle Health Servs.*, 388 N.C. at 401–02. First, Petitioner Rex argues WakeMed's applications "unreasonably project" increasing utilization and purports to challenge Findings of Fact 78–95 and Conclusions of Law 43–48 in the ALJ's Final Decision. Rex contends "[b]oth WakeMed Applications unreasonably project discharges at WakeMed Raleigh will grow at the same annual rate as Wake County's population, 1.39%, each year between FYs 2024 and 2030. All historical data belies those projections." The ALJ, however, directly addressed this very argument in her findings.

Findings of Fact 78–95 provide:

> 78. WakeMed's future utilization projections assumed a 1.39% annual growth rate for all WakeMed campuses. Rex's expert contended these projections were unreasonable and unsupported because his calculation of actual discharges at WakeMed's Raleigh campus showed a decline in discharges at a compound annual growth rate (CAGR) of -1.1% between 2019 and 2023.
>
> 79. However, WakeMed's assumed growth rate was not

without basis. WakeMed explicitly relied on publicly available Claritas Wake County population growth rate data that was provided in the WakeMed [a]pplications. [Rex's expert,] Mr. Carter[,] acknowledged use of publicly available population growth data is not generally unreasonable. He has relied on such data for CON applications himself.

80. Rex's competitive comments during the review argued that WakeMed Raleigh's projected growth rate was unreasonable and unsupported because of its historically declining utilization.

81. When considering Rex's comments, Mr. Yakaboski attributed any decline in utilization subsequent to 2019 as being related to the impact of the COVID pandemic. In addition, he found it extremely reasonable to project future utilization using actual data projected forward at the population growth rate.

82. The Agency considered Rex's comments but nevertheless determined that WakeMed's projected growth rate was reasonable and adequately supported, specifically noting that WakeMed's use of Claritas population data was reasonable. Mr. Carter did not opine that the Agency's conclusion was a mistake; he simply disagreed.

83. WakeMed's expert, David Meyer, pointed out that, during the same period in which Mr. Carter calculated a negative growth rate for WakeMed Raleigh, total utilization for the WakeMed system increased, including at WakeMed Raleigh. Also, while total *discharges* may have fallen, total patient days, another measure of utilization, increased. In Mr. Meyer's opinion, WakeMed's reliance on the Wake County growth rate was reasonable and conservative.

84. No rule or statute requires an applicant to use any particular methodology when projecting utilization or would prevent an applicant from using Claritas data. Mr. Carter just disagreed that it was reasonable to do so under

the circumstances.

*WakeMed 12.9% Decrease in Utilization from 2022 to 2023*

85. Mr. Carter repeatedly criticized WakeMed's projections because he calculated that WakeMed's Raleigh's utilization decreased 12.9% between 2022 and 2023, by comparing annualized 2022 utilization from the 2022 Garner Application (32,546 admissions) to annualized 2023 utilization from the 2023 [a]pplications (28,350 discharges). Mr. Carter opined that the 2023 WakeMed [a]pplications failed to include any information to explain the decrease and that it was unreasonable to project positive future growth in light of the decrease.

86. Mr. Carter also opined that the Agency failed to analyze this decrease and should not have relied on projections from the 2022 Garner Application (which were incorporated into WakeMed's projections in the 2023 [a]pplications) because of the passage of time and WakeMed Raleigh's 12.9% decreased utilization between 2022 and 2023.

87. The Agency, however, accepted WakeMed's premise that the projections from the 2022 Application were still valid, and Mr. Carter identified no rule or statute requiring the Agency to do any particular analysis to verify that the 2022 projections could still be used. Instead, he merely disagreed with the Agency's judgment.

88. Moreover, the evidence demonstrated that Mr. Carter's comparison of annualized utilization data in the 2022 Garner Application versus the 2023 WakeMed [a]pplications is not a meaningful comparison because the former included neonatal (newborn) intensive care unit ("ICU") patients, and the latter did not.

89. The WakeMed health system serves neonatal patients at all of its existing campuses (WakeMed Raleigh, WakeMed North, and WakeMed Cary). The 2023 [a]pplications identify the number of neonatal ICU beds at

all WakeMed campuses. However, WakeMed Garner, which is under development but not yet complete, had not proposed and was not approved to offer obstetrics or neonatal care. Accordingly, while all three existing campuses have neonatal ICU beds and neonatal utilization data, neither the 2022 Garner Application nor the 2023 WakeMed [a]pplications projected any neonatal volume at WM Garner.

90. At WakeMed Raleigh, neonatal patients represented approximately 15,000 patient days of care, or 8.36% of its annual utilization. Thus, excluding these patients from the data used in the 2023 [a]pplications significantly reduced WakeMed Raleigh's stated utilization compared with the prior year's application.

91. WakeMed excluded neonatal patients from its utilization data beginning in 2023, in accordance with the 2023 SMFP which, for the first time, excluded neonatal patients from the data used to identify need for AC beds. WakeMed's 2023 [a]pplications state in multiple places that, in accordance with the change to the SMFP, neonatal patients were excluded from its historical data as well as its projections. Accordingly, the calculation of a purported 12.9% decline in utilization between 2022 and 2023 fails to account for the exclusion of neonatal patients, and . . . Mr. Carter's comparison is not meaningful.

92. The exclusion of neonatal ICU patient data from the 2023 [a]pplications begs the question whether it was valid for WakeMed to use the same utilization projections for WakeMed Garner from the 2022 Garner Application, as described above. In addressing this question, David Meyer opined that the exclusion of neonatal patients had no effect on the projections for WakeMed Garner, including the shift of patients from other WakeMed campuses. Because WakeMed Garner will not offer obstetrics or neonatal ICU care, WakeMed projected no obstetrics or neonatal ICU utilization at WakeMed Garner (or any shift of neonatal ICU patients to WakeMed Garner) in either the 2022 or 2023 WakeMed [a]pplications. Thus, the exclusion of

neonatal ICU patient data in the 2023 [a]pplications affected utilization at other WM campuses but had no impact on the Garner facility.

*Previous Findings*

93. Mr. Carter opined that the Agency's acceptance of WakeMed's projected growth rate in this review was inconsistent with two prior Agency decisions, in which the Agency rejected an applicant's projected growth rate because of a trend of historical utilization decreases. First, in the 2023 Service Area 20 Linear Accelerator Competitive Review, the Agency rejected Rex's projected 0% growth rate (or no growth) because its utilization had declined an average of 5.9% per year for four years (-5.9% CAGR). However, Rex's -5.9% annual utilization decline in that review is several times greater than the -1.1% CAGR that Mr. Carter calculated for WakeMed Raleigh. Further, in that review, Rex did not rely on population growth rate data or any other data to support its projection.

94. Second, in the 2022 Durham/Caswell AC Beds Competitive Review, the Agency rejected utilization projections by Duke, in part, because Duke's historical utilization had been flat for several years, but also because Duke's projected significant utilization growth was not reasonable and not adequately supported. Further, Duke's projected growth did not rely on population growth, or any other independent source of data, to support its projected utilization, unlike WakeMed's in this review.

95. Rex identified no requirement that the Agency must follow the same analysis as in a prior review, and in fact our courts have held otherwise. *Duke Univ. Health Sys. V. N.C. Dep't of Health & Human Servs.*, -- N.C. App. --, --, 905 S.E.2d 729, 740 (2024) ("The task before the Agency is multifaceted, and the CON review process does not demand that it apply a fixed lens to every case, especially where some considerations may be more salient in a given case than in others."). Even if there were such a requirement, . . . neither of the prior reviews relied on by

Rex's expert were sufficiently similar to have probative value here.

(Citations omitted.)

Conclusions of Law 43–48 provide:

43. Rex contends that the Agency erroneously accepted WakeMed's projected growth rate for WakeMed Raleigh's utilization, which was based on Claritas population growth rate data, but which Mr. Carter opined was unreasonable in light of historical trends at Raleigh.

44. No statutes or rules detail any required procedure or the way in which the Agency must evaluate conformity to Criterion 3 generally or the utilization projections and the assumptions underlying them more specifically. Evaluation of Criterion 3 falls squarely within the Agency's authority and jurisdiction. Accordingly, there is no basis to conclude that the Agency erred within the meaning of N.C.[G.S.] § 150B-23(a)(1), (3), or (5).

45. Rex did not demonstrate that the Agency's acceptance of WakeMed's proposed growth rate was accidental, unintentional, or otherwise mistaken. Therefore, Rex did not show that the Agency acted "erroneously" within the meaning of N.C.[G.S.] § 150B-23(a)(2).

46. Nor does the evidence support the conclusion that the Agency's acceptance of WakeMed's projected growth was arbitrary and capricious. Mr. Carter's disagreement with the Agency that WakeMed's projected growth rate was reasonable and adequately supported does not render that conclusion arbitrary or capricious.

47. Rex bore the burden of proving that the Agency's acceptance of the projected growth at Raleigh was whimsical, unreasoned, or an abuse of discretion, and Rex did not meet this burden. Whether Rex or this Tribunal might have reasonably reached a different conclusion is irrelevant. As such, Rex has failed to prove that the Agency

acted arbitrarily or capriciously pursuant to N.C.[G.S.] § 150B-23(a)(4).

48. Accordingly, Petitioners have not demonstrated any basis under N.C.[G.S.] § 150B-23(a) to reverse the Agency's determinations that both WakeMed [a]pplications were conforming to Criterion 3 and the Performance Standard[s].

(Citations omitted.)

A review of the whole record reveals that, while Rex and Duke may have disagreed with the methodology, they have failed to show that these findings were not supported by substantial evidence. *See Pinnacle Health Servs.*, 388 N.C. at 398. Even where Petitioners argue some of the evidence should have led to another result, such as "WakeMed previously acknowledg[ing] WakeMed Raleigh's declining utilization, confirming an average annual decline of 2.5% in admissions there each year from FY 2018-22[,]" the reviewing court "may not substitute its judgment for the ALJ's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter *de novo*." *Ledford*, 247 N.C. App. at 286.

Furthermore, Rex specifically maintains on appeal that "WakeMed offers no explanation why it is reasonable to project population growth will reverse WakeMed Raleigh's negative historical trend when such growth hasn't translated to increased utilization there since at least 2018[,]" and that, "[i]n other reviews, the Agency has required applicants to explain why it was reasonable for projections to deviate from historical trends." The ALJ's Findings of Fact 93–95, however, address this very

issue, finding that the Agency's previous required explanations were dissimilar to the projections here; Rex offers no new arguments on appeal. Again, a review of the whole record reveals that, while Rex disagreed with the outcome, Rex has failed to show that these findings were not supported by substantial evidence. See *Pinnacle Health Servs.*, 388 N.C. at 398.

Petitioners next argue that, when recalculating WakeMed's projection numbers, the Agency "ignored the fact the 2022 WakeMed Garner Application's projections haven't been updated." As the ALJ found, however, in Findings of Fact 86–92, this argument did not hinder WakeMed's conformity where the 2022 Garner Application "included neonatal (newborn) intensive care unit [] patients, and the [WakeMed 2023 application] did not."

Rex finally argues that "the Garner Application's projections fail to extend far enough to show how they would impact the WakeMed North Application's conformity with the Performance Standards, which depend on the projections in the third project year." The ALJ, however, found:

> 73. It was not unreasonable for the Analyst to hold the projected shift constant from FY 2029 to FY 2030 when analyzing the projections for FY 2030 in the WakeMed North [a]pplication. The Analyst and Assistant Chief both considered it a conservative assumption to hold the FY Garner Patient Shift constant for FY 2030. That assumption was also consistent with another step in the WakeMed North [a]pplication's projections where the patient shift from zip code 27610 from WakeMed Raleigh to Garner was held constant from FY 2029 to FY 2030.

74. In addition, Mr. Carter did not testify that a different, more conservative assumption in FY 2030 would have had any effect on WakeMed's conformity. In fact, Mr. Carter did no analysis to quantify what a larger, or different, shift in fiscal 2030 would do to WakeMed's conformity with the [P]erformance [S]tandard[s].

(Citations omitted.) A review of the whole record reveals these findings were supported by substantial evidence, and accordingly, Petitioners' arguments are overruled. *See id.* We thus conclude the ALJ properly determined WakeMed conformed with the required criteria.

## C. Comparative Analysis

Petitioners next argue that "[t]he ALJ's Findings of Fact regarding the comparative analysis are erroneous, not supported by the evidence, and arbitrary."

"In a competitive review, where the Agency finds more than one applicant conforming to the applicable review criteria, it may conduct a comparison of the conforming applications to determine which applicant should be awarded the CON." *Craven Reg'l Med. Auth. v. N.C. Dep't of Health & Hum. Servs.*, 176 N.C. App. 46, 58 (2006) (citation omitted). We have previously explained that "[t]he comparative analysis performed by the CON Section is a matter within [the Agency's] discretion, and '[t]here is no statute or rule which requires the [CON Section] to utilize certain comparative factors.'" *WakeMed*, 222 N.C. App. at 770 (alterations in original) (quoting *Craven*, 176 N.C. App. at 58). "When the issue on appeal is whether a state agency erred in interpreting a statutory term, an appellate court may freely

substitute its judgment for that of the agency and employ *de novo* review." *Britthaven,*

*Inc. v. N.C. Dep't of Hum. Res.*, 118 N.C. App. 379, 384 (1995) (citation omitted). Thus,

where Duke and Rex challenge the ALJ's findings of fact as arbitrary or unsupported,

as explained above, we apply the whole record test, *see Pinnacle Health Servs.*, 388

N.C. at 398, and where Petitioners challenge an error of law regarding the

interpretation of a statute, we apply de novo review, *see CaroMont*, 231 N.C. App. at

4; *see also Britthaven*, 118 N.C. App. at 384.

## 1. Scope of Services

For the scope of services factor the Agency used and found in favor of Rex, Duke

argues "[t]he ALJ's findings and determination regarding this comparative factor

were the result of its erroneous and incomplete consideration of the facts in this

review and evidence at hearing." Specifically, Duke takes issue with the way the

Agency determined the scope of services, claiming the Agency "concluded that the

Rex Application was a more effective alternative solely because it was identified as a

tertiary hospital, without any analysis or evaluation of the services actually provided

or proposed to be provided at the applicant hospitals[,]" and purports to challenge the

ALJ's Findings of Fact 123–126.

Findings of Fact 123–126 provide:

> 123. Rex is a tertiary hospital, meaning that it provides
> higher acuity level services. Tertiary hospitals offer a
> greater scope of services than community hospitals. The
> only other tertiary hospital in Wake County is WakeMed
> Raleigh Hospital, which did not submit an application in

this review.

124. As the only tertiary hospital in the review, the Agency concluded that the Rex [a]pplication was the more effective application with respect to scope of services. It is undisputed that Rex Hospital will offer a greater scope of services than the other applicant hospitals in the review.

125. Duke's expert, Mr. Sullivan, did not dispute that the Rex [a]pplication had the broadest scope of services but opined that scope of services is not a particularly meaningful way to compare the applicants and that the Agency should not have compared the applications on the scope of services factor.

126. The Agency's reasoning and its conclusion that the Rex [a]pplication was more effective with respect to scope of services were reasonable and clearly explained in the [f]indings. There is no evidence that the Agency's discussion contained inaccuracies or that its conclusion was the result of any mistake. Instead, Duke simply disagrees with the reasoned judgment of the Agency.

(Citations omitted.) Utilizing the whole record test, we conclude the Agency had a "rational basis in the evidence" for determining that Rex, as a tertiary hospital, offered a greater scope of services. *Carroll*, 358 N.C. at 674. It is for the Agency, not us, "to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence, if any." *Id.* Duke may disagree with the way the Agency determined the scope of services, but it is within the purview of the Agency to establish the "criteria" required "to carry out the provisions and purposes" of the CON Article. N.C.G.S. § 131E-177(1) (2023). Thus, we affirm the ALJ's decision as to the

scope of services factor as it is supported by substantial evidence. *See Pinnacle Health Servs.*, 388 N.C. at 401.

## 2. Geographic Accessibility

For the geographic accessibility factor the Agency used and found in favor of WakeMed, Duke contends the Agency failed to properly provide the reasons for reaching its determinations and to support its decision with sufficient evidence for the ALJ to affirm the Agency's decision, which it is required to do by statute. In a similar vein, Rex argues "[t]he ALJ's erroneous and arbitrary affirmance of the Agency's Geographic Accessibility factor findings violates the CON statute because those findings are completely untethered to any statutory objective." Because Duke and Rex challenge this conclusion based on statutes, we review any errors of law de novo, *see CaroMont*, 231 N.C. App. at 4, and we review any challenges of arbitrariness or unsupported findings under the whole record test, *see Pinnacle Health Servs.*, 388 N.C. at 398.

Pursuant to N.C.G.S. § 131E-186(b), "the [Agency] shall provide written notice of all the findings and conclusions upon which it based its decision, including the criteria used by the [Agency] in making its decision, to the applicant." N.C.G.S. § 131E-186(b) (2023). Furthermore, specific to this comparative factor, N.C.G.S. § 131E-175(3) provides "[t]hat, if left to the market place to allocate health service facilities and health care services, geographical maldistribution of these facilities and services would occur and, further, less than equal access to all population groups,

especially those that have traditionally been medically underserved, would result."

N.C.G.S. § 131E-175(3) (2023).

Here, the ALJ made findings of fact pertaining to the Agency's reasoning for its decision and how this decision supported the statutory objective of preventing geographical maldistribution:

> 127. The CON law is intended, in part, to protect against geographic maldistribution of medical services and equipment. *See* N.C.[G.S.] § 131E-175(3). The geographic accessibility comparative factor advances this purpose by promoting access within the service area, including access to underserved residents in rural areas, and avoiding geographic maldistribution, which is a concentration of services in one part of a service area and a relative lack of services elsewhere.
>
> 128. In evaluating the geographic accessibility factor, the Agency first identified the total number of existing, approved, and proposed acute care beds by region within the county. That analysis showed that central part of Wake County had by far the most beds, compared with all other areas of the county.
>
> 129. The Agency then looked specifically at each application's proposed location by region. The Agency concluded that *the Rex Application and the Duke Application both proposed to locate the beds in Central Wake County where there are already the most beds* (1,117 beds), whereas both of the *2023 WakeMed Applications proposed to locate new beds in areas that currently have far fewer beds*: the western part of Wake County, where there are only 200 beds currently, and the northern part of Wake County, where there are only 71 beds currently.
>
> 130. Because the 2023 WakeMed Applications proposed to place the beds in regions with much fewer beds than the region, the Rex Application and Duke Application proposed

to place the beds, the Agency found that the 2023 WakeMed [a]pplications were more effective with respect to geographic accessibility.

131. Rex criticized the Agency's classification of the applicants' locations by geographic area; specifically, that the Agency did not include WakeMed North in the "Central" region even though WakeMed North has a Raleigh address. Rex also criticized the Agency for not delineating the borders of the regions it identified. However, the Agency expressly "note[d] that while WakeMed North Hospital does have a Raleigh address[,] the address in the table [contained in the Findings] is listed as 'North Raleigh' to emphasize its difference in location in relation to Duke Raleigh Hospital and Rex Hospital." It further noted that WakeMed North is located off the outer loop (I-540). In contrast, Duke Raleigh Hospital and Rex Hospital are both located off the inner loop (I-440). *The Agency considered the applicants' locations to be self-evident, and did not consider it necessary to draw boundaries to categorize the applicants' locations by region*.

132. Rex took issue with the Agency for not calculating ratios of beds to population, projected or historical utilization, or rates of underserved persons by geography in evaluating the comparative superiority of applications regarding geographic accessibility.

133. However, *there is no rule, statute or policy that governs the analysis of this comparative factor, or any other comparative factor*. Neither is there a rule, statute or policy that advises the Agency how to define geographic areas when it is evaluating the geographic access factor. The "CON review process does not demand that it apply a fixed lens to every case, especially where some considerations may be more salient in a given case than others."

134. Likewise, Rex faulted the Agency for not determining whether there is geographic maldistribution in Wake County. However, there is no requirement that the Agency find that geographic maldistribution has already occurred

before it may use this comparative factor. Indeed, the purpose of this factor is to *avoid* geographic maldistribution.

135. While Rex's and Duke's experts disagreed with and criticized the Agency's analysis and conclusions under the geographic accessibility factor in this review, neither identified any requirement that the Agency failed to meet.

136. Both Rex and Duke also pointed out prior reviews in which they contend the Agency evaluated geographic accessibility differently than this review. However, the circumstances in those prior reviews were different from this review.

. . . .

137. WakeMed's expert identified several other reviews where the Agency analyzed this comparative factor similarly as it did in this review. In those other reviews, the Agency specifically determined that an addition of acute care beds in parts of a county that had either no acute care beds, or a lower concentration of beds, were more effective regarding geographic accessibility. In each of these reviews, the Agency consistently applied a concept of avoiding concentration of acute care resources in one part of the county and avoiding geographic maldistribution in a different part of the county[.] In addition, Rex's expert in this review agreed that the Agency defined the geographic areas in the 2022 Wake County Acute Care Beds and [Operation Room] Review[,] in the same way the Agency defined the geographic areas in this review.

138. The Agency's analysis of this comparative factor by geographic area was reasonable, and was consistent with the purpose of this factor because it favored locations that would avoid the further concentration of AC beds in the center of the county.

139. The Agency's reasoning and its conclusions that the 2023 WakeMed [a]pplications were comparatively more

> effective with respect to geographic accessibility were reasonable and clearly explained in the [f]indings. There is no evidence that the Agency's discussion contained inaccuracies or that its conclusion was the result of any mistake. Instead, Petitioners simply disagree with the reasoned judgment of the Agency.

(Some alterations in original, emphasis added, and citations omitted.)

First, under our de novo review, the ALJ properly found the Agency determined WakeMed's proposal would prevent further geographical maldistribution, pursuant to N.C.G.S. § 131E-175(3), where the new acute beds would be in geographical locations that currently have fewer beds. *See* N.C.G.S. § 131E-175(3). Second, after a review of the whole record, we hold the Agency made appropriate "findings and conclusions" for its decision, "including the criteri[on][,]"— even where the criterion was unfavorable to Rex and Duke—involving where the number of beds were located throughout Wake County. *See* N.C.G.S. § 131E-186(b).

Additionally, Duke contends that the "lack of any statutes, rules, or policies should raise the bar for the Agency to have to explicitly state the reasoning and analysis for its decision in reaching its conclusion. The Agency['s] [f]indings lack any reasoned analysis or data that it considered beyond merely noting where beds currently exist." It is within the Agency's purview, however, to establish the "criteria" required "to carry out the provisions and purposes" of the CON Article, and the criterion here was where acute beds were currently located geographically. N.C.G.S. § 131E-177(1). Thus, we affirm the ALJ's decision as to the geographical accessibility

factor as it is supported by substantial evidence. *Pinnacle Health Servs.*, 388 N.C. at 401.

### 3. Historical Utilization

Next, Rex argues the Agency's conclusion that WakeMed's applications were more effective with respect to the comparative factor of historical utilization was erroneous. Rex contends "[t]he ALJ erroneously and arbitrarily affirmed that Agency conclusion, which was also not supported by record evidence, because that conclusion had no statutory basis in the CON Law."[1] Specifically, Rex argues "the Agency found the WakeMed [a]pplications more effective because the WakeMed Health System has a comparatively higher historical bed utilization than the UNC and Duke systems[,]" but "[w]hen considering both licensed and approved (but undeveloped beds), Rex's utilization exceeds WakeMed North by 20.4%. So long as the Agency erroneously and arbitrarily limits its analysis to system comparisons, individual hospitals with greater capacity constraints, like Rex, will suffer." For historical utilization, the ALJ made the following relevant findings:

> 140. The historical utilization factor promotes quality healthcare by generally favoring an applicant with higher historical utilization because it is indicative that the applicant is providing quality, affordable care.

---

[1] Although Rex claims this conclusion "had no statutory basis in the CON Law[,]" Rex does not argue in what way it is statutorily inappropriate; thus, this portion of the argument is abandoned. *See K2HN Constr. NC, LLC v. Five D Contractors, Inc.*, 267 N.C. App. 207, 213 (2019) ("This Court has routinely held an argument to be abandoned where an appellant presents argument without . . . authority . . . ."); *see also* N.C. R. App. P. 28(b)(6) (2025) (providing that "[i]ssues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned").

141. To compare historical utilization, the Agency calculated the utilization percentage for all existing AC beds in the service area by health system based on the most recent license renewal application data through September 2022. That data showed that WakeMed's hospitals collectively were operating at 79.45% occupancy, whereas Rex's hospitals were only operating at 74.92% occupancy, and Duke was operating at 72.90% occupancy. Moreover, the analysis noted that the most recent historical data in the 2024 SMFP showed that WakeMed had the highest system deficit of AC beds among all three systems.

142. Accordingly, the Agency concluded that the 2023 WakeMed Applications were more effective with respect to historical utilization.

143. Both Rex and Duke criticized the Agency's decision to compare historical utilization by <u>system</u>, rather than based on the <u>individual hospitals</u> at which the applicant applied to place the beds. Both contended it would be better to compare the utilization of the <u>individual hospitals</u>, instead of the applicants' health <u>system</u>, as such comparison would be more consistent with the language of the [f]indings. However, the Agency believes it is appropriate to compare applicants by system under this factor because (1) the need for AC beds in the SMFP is determined by <u>system</u> utilization and (2) a health <u>system</u> includes not only the original facilities, but other facilities, i.e. an expansion, which have come after. WakeMed's expert also agreed that comparing historical utilization based on system utilization is reasonable and consistent with the AC bed methodology in the SMFP.

144. No policy, statute, or rule requires that historical utilization be compared by facility. Rex's expert identified one prior example where the Agency evaluated historical utilization on a facility basis, as Petitioners suggest. However, more recent reviews have compared historical utilization by system as the Agency did in this review, including a review by a different [a]nalyst.

145. Further, the Agency's comparison of system utilization is consistent with the Performance Standard[s], which requires system utilization to meet a target occupancy rate. 10A NCAC 14C.3803(4) and (5)[.]

146. The Agency's reasoning and its conclusions that the 2023 WakeMed [a]pplications were comparatively more effective with respect to historical utilization were reasonable and clearly explained in the [f]indings. There is no evidence that the Agency's discussion contained inaccuracies or that its conclusion was the result of any mistake. Instead, Petitioners simply disagree with the reasoned judgment of the Agency.

(Citations omitted.) Utilizing the whole record test, we conclude the Agency had a "rational basis in the evidence" for determining that WakeMed, as a *system*, rather than as an individual hospital, had greater historical utilization. *Carroll*, 358 N.C. at 674. Rex may disagree with the way the Agency determined the historical utilization, but it is within the purview of the Agency to establish the "criteria" required "to carry out the provisions and purposes" of the CON Article. N.C.G.S. § 131E-177(1). Thus, we affirm the ALJ's decision as to the historical utilization factor as it is supported by substantial evidence. *Pinnacle Health Servs.*, 388 N.C. at 401.

*4. Competition (Patient Access to a New or Alternative Provider)*

Next, Rex argues the Agency's conclusion that Duke's application was more effective as to the comparative factor of competition was erroneous. Rex contends "[t]he ALJ erroneously and arbitrarily affirmed that Agency conclusion, which was also not supported by record evidence, because that conclusion had no statutory basis

in the CON Law[2] and no supporting reasoning." Specifically, Rex argues "[t]he Agency found Duke more effective under" this factor "solely because the Duke Health System controls a smaller number of beds in Wake County than the UNC or WakeMed health systems[,]" and "failed to cite any evidence to support its presumption that awarding beds to Duke will incentivize Rex (or WakeMed) to improve quality or lower costs."

For this factor, the ALJ made the following relevant findings:

> 147. The competition factor relates to Criterion 18a (N.C.[G.S.] § 131E-183(a)(18a)) as competition will have a positive or negative effect upon the cost-effectiveness, quality, and patient access to the services proposed. The competition factor also relates to the finding in N.C.[G.S.] § 131E-175(1) that the reimbursement of health services limits the effects of free market competition. Thus, it's necessary to control some of the facts like policy utilization, distribution of the facilities, complements of those facilities.

> 148. The Agency used the competition factor to compare the applications in this review because generally, a new entrant to the service area market would have produced increased patient choice, quality, and lower costs. In other words, this factor promotes competition by favoring the entry of a new provider into the service area market. Even though none of the applicants in this review is [sic] a new provider, an existing provider in the market, if they have added resources, can add something to the market and potentially enable whoever receives those new resources to expand what they're offering. Thus, the expansion of an existing provider that holds less of a market share of acute

---

[2] Although Rex claims this conclusion "had no statutory basis in the CON Law[,]" Rex does not cite or argue how it is statutorily inappropriate; thus, this portion of the argument is deemed abandoned. *See K2HN Constr.*, 267 N.C. App. at 213; *see also* N.C. R. App. P. 28(b)(6).

care beds than another provider would presumably encourage all providers in the service area to improve quality or lower costs to compete for patients.

149. One way to promote competition is by allowing smaller providers to grow within a market if they can document a need for services they are proposing.

150. In evaluating market share, the Agency identified the number of existing and approved acute care beds each applicant held (by system) in Wake County and calculated the percentage of the acute care beds each applicant controlled. That analysis showed that WakeMed controls 54.27% of all acute care beds in Wake County, Rex controls 32.21%, and Duke controls 13.52%. It then compared the percentage that each applicant would control if its application(s) were approved. Because Duke controlled and would continue to control the smallest percentage of Wake County AC beds by far, the Agency concluded that the Duke Application was the more effective application with respect to competition.

151. Mr. Carter opined that the Agency's analysis was illogical because it presumed that applicants who have more beds need to lower costs and provide higher quality without any analysis or conclusion that Rex's quality was deficient. However, as Ms. Pittman explained, the Agency presumes that additional competition would have a positive incentive on all hospitals to improve quality and cost.

152. Mr. Carter acknowledged that the CON Act is intended to foster competition. He did not disagree with the Agency's presumption that competition would incentivize improvements in quality and cost in general, and did not dispute the Agency's authority to make such a presumption. Nor did Mr. Carter rely on any rule, statute, or other authority to support his opinion. Rather, he merely disagreed with the Agency's reasoned judgment in this review.

153. Mr. Carter opined that the Agency should have found all three applicants in this review equally effective because all are existing providers. Mr. Carter based his opinion on a 2018 review in which the Agency applied a similarly-named factor ("Patient Access to New Provider" in that review) and found all applicants equally effective because all were existing providers, instead of distinguishing between competing providers based on market share.

154. However, several more recent reviews were consistent with the findings in this review and revealed the Agency preferred a smaller existing provider over a larger one.

> a. In the 2022 Durham-Caswell Acute Care Bed Review, the Agency found that UNC, an existing provider with already approved but not yet constructed beds, was the more effective alternative, regarding the comparative factor of competition (patient access for a new or alternate provider), as UNC controlled fewer acute care beds in the service area.

> b. In the 2018 Mecklenburg Acute Care Beds & ORs Review, the Agency found the existing provider with the smaller percentage of existing and approved acute care beds in Mecklenburg County was the most effective alternative regarding the comparative factor of competition.

> c. Similarly, in the 2022 Wake County Acute Care Bed and OR Review, the Agency found expansion of an existing provider that controlled fewer acute care beds than another provider was a more effective alternative under the comparative factor of competition (patient access to a new or alternate provider).

155. In this review, the Agency's reasoning, and conclusions that the Duke Application was comparatively more effective with respect to competition were reasonable and clearly explained in the [f]indings. There is no evidence

that the Agency's discussion contained inaccuracies or that its conclusion was the result of any mistake. Instead, Rex simply disagrees with the reasoned judgment of the Agency.

(Citations omitted.) Under the whole record test, we conclude the Agency had a "rational basis in the evidence," *Carroll*, 358 N.C. at 674, for determining that Duke "controlled and would continue to control the smallest percentage of Wake County AC beds by far," and thus would be a more effective application with respect to competition. Rex may disagree with the way the Agency determined this factor, but again, it is within the purview of the Agency to establish the "criteria" required "to carry out the provisions and purposes" of the CON Article. *See* N.C.G.S. § 131E-177(1). The ALJ found in Finding of Fact 152, which is supported by testimony, that Rex's own expert "did not disagree with the Agency's presumption that competition would incentivize improvements in quality and cost in general, and did not dispute the Agency's authority to make such a presumption." Thus, we affirm the ALJ's decision as to this factor as it is supported by substantial evidence. *Pinnacle Health Servs.*, 388 N.C. at 401.

## 5. Access by Service Area Residents

Next, Rex argues the Agency's conclusion that the comparative factor of access by service area residents was inconclusive and contends "[t]he ALJ erroneously and arbitrarily affirmed the Agency conclusions here, which were also not supported by

record evidence, because those conclusions had no statutory basis in the CON Law[3]

or in fact." Specifically, Rex argues "[i]t isn't mathematically possible to conclude

WakeMed or Duke could project more Wake County patients than Rex."

Here, the ALJ made the following Findings of Fact regarding this factor:

> 156. The access by service area residents factor generally favors the applicant projecting to provide the most service to residents of the service area who should benefit from the need determination for additional AC beds in the service area where they live.

> 157. However, the Agency does not evaluate the number of patients being served by different applicants in isolation. The Agency also considers the impact of other aspects of the hospital's operations on these numbers, including acuity level of patients, level of care at facility, and number and types of acute care bed services.

> 158. In this review, the Agency identified the number of Wake County patients each applicant projected to serve and calculated the percentage of its total patients that number represented.

> 159. The projected numbers of Wake County residents were included in the Rex [a]pplication and the Duke [a]pplication, which projected patient origin by county. However, the Agency could not determine how many of WakeMed's projected patients were residents of the service area because WakeMed projected patient origin by zip code, which is also allowed. Since zip codes often cross county lines, the Agency could not identify a total number of service area residents or calculate a percentage for WakeMed. Thus, the Agency concluded that it could not effectively compare the 2023 WakeMed [a]pplications on

---

[3] Although Rex claims this conclusion "had no statutory basis in the CON Law[,]" Rex does not cite or argue how it is statutorily inappropriate; thus, this portion of the argument is deemed abandoned. *See K2HN Constr.*, 267 N.C. App. at 213; *see also* N.C. R. App. P. 28(b)(6).

this factor.

160. The Agency also identified other differences among the proposals that made a comparison of this factor inconclusive as between all applications, such as differences in the acuity level of patients at each hospital, the level of care available at each hospital, and the scope of services provided at each hospital. Based on those differences, the Agency concluded that a comparison on [sic] the access by service area residents' factor would be ineffective and found the factor inconclusive.

161. Duke's and WakeMed's experts both agreed with the Agency that this factor was inconclusive. But Rex's expert opined that the Agency should have compared the applicants only based on the total projected number of Wake County residents, not as a percentage, and should have found Rex more effective.

162. Mr. Carter's opinion relies on language in the [f]indings referring to the number of service area residents. However, the Agency has repeatedly based its comparison on the percentage of service area residents, not only the total number, in numerous recent reviews. Also, comparing applicants only on the basis of total number of service area residents, as Rex suggests, would always give the largest hospital applicant an advantage.

163. WakeMed's expert did not disagree with how the agency conducted its analysis on this factor as the Agency has discretion in how to conduct this analysis. Mr. Meyer opined that the Agency's approach in conducting its analysis was reasonable and consistent with the way the agency conducted its analysis in prior reviews as well.

164. Lastly, both Mr. Meyer and Mr. Carter acknowledged that the differences between the applicant hospitals that rendered this comparative factor inconclusive could cut for or against any applicant. Mr. Carter also acknowledged that the Agency has found this factor inconclusive in numerous previous reviews for similar reasons.

> 165. The Agency's reasoning and its conclusions that the access to service area residents' factor was inconclusive was based on a combination of several reasons, was reasonable and clearly explained in the [f]indings. There is no evidence that the Agency's discussion contained inaccuracies or that its conclusion was the result of any mistake. Instead, Rex simply disagrees with the reasoned judgment of the Agency.

(Citations omitted.) Under the whole record test, we conclude the Agency had a "rational basis in the evidence," *Carroll*, 358 N.C. at 674, for determining that this factor was inconclusive where the Agency, for several reasons as found above, concluded a comparison would be ineffective. Rex may disagree with the Agency, but again, it is within the purview of the Agency to establish the "criteria" required "to carry out the provisions and purposes" of the CON Article, *see* N.C.G.S. § 131E-177(1), and it is for the Agency, not the reviewing court, "to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence, if any[,]" *Carroll*, 358 N.C. at 674. Thus, we affirm the ALJ's decision as to this factor as it is supported by substantial evidence. *Pinnacle Health Servs.*, 388 N.C. at 401.

### 6. Access by Underserved Groups – Medicaid

Finally, Rex argues "[t]he ALJ erroneously and arbitrarily affirmed that Agency conclusion, which was also not supported by record evidence, because that

conclusion had no statutory basis in the CON Law[4] and was not supported by the

record facts." Specifically, Rex contends:

> The Agency concluded Rex projected the highest percentage of Medicaid among the applicants in this review, but failed to credit it for doing so. It declined to draw a comparison based on differences among the applicants and the type of services they offer. However, the Agency has drawn conclusive comparisons under such circumstances before.

Here, the ALJ made the following findings regarding this factor:

> 166. Projected Medicare and Projected Medicaid are treated as two separate factors, which are intended to improve access to underserved groups. In comparing applications based on projected access to the underserved, the Agency typically compares the projected percentage of each applicant's gross revenues attributable to Medicare and Medicaid patients and favors applicants with higher percentages.

> 167. Here, the Agency concluded that Duke projected the highest percentage of its revenue attributable to Medicare patients, and Rex projected the highest percentage of its revenue attributable to Medicaid.

> 168. However, as with access by service area residents, the Agency does not evaluate the percentage of revenue attributable to these underserved groups in isolation but also considers the impact of other aspects of the hospitals' operations on these numbers.

> 169. Here, the Agency concluded that differences in the way in which the different hospitals presented their financial statements, the number of patients that each

---

[4] Although Rex claims this conclusion "had no statutory basis in the CON Law[,]" Rex does not cite or argue how it is statutorily inappropriate; thus, this portion of the argument is deemed abandoned. *See K2HN Constr.*, 267 N.C. App. at 213; *see also* N.C. R. App. P. 28(b)(6).

facility proposed to serve, the acuity level of patients at each facility, and the level of care each hospital provided prevented the Agency from making a meaningful comparison. Accordingly, it concluded that a comparison on [sic] the access by underserved groups factors would be ineffective, and the analysis of both factors was inconclusive.

170. Mr. Sullivan and Mr. Meyer agreed with the Agency that any conclusion that could be drawn under these factors would not be meaningful. The Agency's analysis and conclusions under both of these factors were also consistent with several other recent reviews.

171. Rex's expert, on the other hand, concluded that a comparison could be made. He opined that if a comparison were drawn, Rex would be considered more effective with respect to Medicaid and Duke would be considered more effective with respect to Medicare. He further opined that if the applicants were tied, this factor could be used as a tie breaker and that Rex should be favored because Medicaid patients are more underserved than Medicare.

172. However, Mr. Carter identified no rule or other requirement that the Agency do so, nor any previous example where these factors were used as a tie breaker as Mr. Carter suggested. Instead, he acknowledged that the Agency's analysis and conclusions under these factors was consistent with other reviews, in which these factors were found inconclusive for similar reasons. Consequently, Mr. Carter merely disagrees with the Agency's analysis and conclusions in this review.

173. The Agency's reasoning and its conclusions that the access by underserved groups factors were inconclusive were reasonable and clearly explained in the [f]indings. There is no evidence that the Agency's discussion contained inaccuracies or that its conclusion was the result of any mistake. Instead, Rex simply disagrees with the reasoned judgment of the Agency.

(Citations omitted.) Again, under the whole record test, we conclude the Agency had a "rational basis in the evidence," *Carroll*, 358 N.C. at 674, for determining that this factor was inconclusive where the Agency, for the several reasons found above, concluded a comparison would be ineffective. Rex may disagree with the Agency, but as the ALJ found, there was substantial evidence to support this conclusion. Thus, we affirm the ALJ's decision as to this factor as it is supported by substantial evidence. *Pinnacle Health Servs.*, 388 N.C. at 401.

Accordingly, based on the reasoning above, we affirm the ALJ's Final Decision.

### D. Substantial Prejudice

Lastly, Duke and Rex contend the ALJ erred in concluding they were not substantially prejudiced by the Agency's approval of WakeMed's applications and the denial of Duke's and Rex's applications.

"[A] petitioner in a CON case must show (1) either that the agency (a) has deprived the petitioner of property, (b) ordered the petitioner to pay a fine or civil penalty, or (c) substantially prejudiced the petitioner's rights, *and* (2) that the agency erred in one of the ways described above." *Surgical Care Affiliates, LLC v. N.C. Dep't of Health & Human Servs.*, 235 N.C. App. 620, 624 (2014) (citations omitted); *see also* N.C.G.S. § 150B-23(a) (2023).

Because a petitioner must show the Agency erred in tandem with showing substantial prejudice, and because we affirm the ALJ's Final Decision that the Agency did not err, we need not address this last argument. *See Surgical Care*

*Affiliates,* 235 N.C. App. at 624.

## V. <u>Conclusion</u>

Upon careful review, we conclude: first, WakeMed did not materially amend its application where the information was previously available to the Agency; second, the Agency properly found WakeMed conformed to the standards when reworking the projection numbers as it was allowed to do, and the decision was supported by competent evidence; and third, the Agency's findings on the comparative analysis did not violate any statutes, and were supported by substantial evidence. Because we determine Petitioners did not show error in the Agency's decision, we do not reach Petitioners' substantial prejudice argument.

AFFIRMED.

Judges ZACHARY and STADING concur.